## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>    *Plaintiff*,   )<br>   )<br>v.   )<br>   )<br>AMIRE NEWSOME a/k/a "Mire,"   )<br>JAHAZ LANGSTON a/k/a "Haz," and   )<br>LUIS GARCIA a/k/a "Ebk Lou,"   )<br>    *Defendants*.   ) | CASE NO. 3:20-CR-00058 (KAD)<br><br><br><br>January 8, 2025 |

### FINDINGS OF FACT POST-*FATICO* HEARING

Kari A. Dooley, United States District Judge,

Defendants Luis Garcia, Jahaz Langston, and Amire Newsome pleaded guilty to Count One of the Third Superseding Indictment, which charged each with RICO Conspiracy in violation of 18 U.S.C. § 1962(d). Each admitted to participating in a RICO conspiracy arising out of his involvement with a street gang and racketeering enterprise "O.N.E." Each admitted that certain racketeering acts were within the scope of the RICO conspiracy, including, *inter alia*, narcotics trafficking, the interstate theft and transportation of motor vehicles, and firearms possession. The Third Superseding Indictment alleged additional racketeering acts as within the scope of the charged conspiracy, to include, as relevant here, murder and conspiracy to commit murder of rival gang members, also known as "opps." Specifically, the Government alleges that on August 13, 2018, Luis Garcia conspired to murder rival gang members and participated in the drive-by shooting and murder of Len Smith; and that Amire Newsome and Jahaz Langston conspired to murder rival gang members or their relations on March 7, 2021, and participated in the attempted murder of Shelby Johnson. At each change of plea proceeding, it was agreed that the Government would be left to its proof at a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), as to Defendant Garcia's involvement in the conspiracy to murder and the murder of Len

Smith, and as to Defendants Newsome's and Langston's involvement in the conspiracy to murder and attempted murder of Shelby Johnson.[1] The Court held such a hearing over the course of three non-consecutive days in May 2024. Subsequently, the parties submitted briefing with proposed findings of fact based upon the evidence adduced.

The Court's findings of fact will determine the Defendants' applicable advisory guideline range, and specifically, whether there should be an additional "group" based upon an additional racketeering act of conspiracy to commit murder, murder, or attempted murder for purposes of calculating the RICO Conspiracy guideline range. For purposes of sentencing, the Government bears the burden of proving disputed facts by a preponderance of the evidence. *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). This standard requires the Court to determine whether the existence of a fact is more probable than not. *See United States v. Gigante*, 94 F.3d 53, 55–56 (2d Cir. 1996). Upon review of the evidence and the parties' submissions, the Court concludes that the Government has met this burden: specifically, that Defendant Garcia conspired to murder rival gang members and participated in the murder of Len Smith, and that Defendants Langston and Newsome conspired to murder rival gang members or their relations and participated in the attempted murder/shooting of Shelby Johnson. On these issues, the evidence is overwhelming when viewed through the lens of a preponderance of the evidence burden of proof.

**The RICO Enterprise**

The Court begins with facts that are not in dispute as a means of providing background and context for the murder of Len Smith and the shooting of Shelby Johnson. O.N.E. was a street gang

---

[1] Defendant Newsome, in his plea agreement, left the Government to its proof with respect to each of the racketeering acts alleged to be within the scope of the RICO conspiracy. These included: a conspiracy to distribute narcotics; the interstate transportation and possession of stolen vehicles; the Hobbs Act robbery on March 25, 2020 at a Citgo gas station; the carjacking of a Toyota Corolla on March 25, 2020; and the conspiracy to murder or attempt to murder Shelby Johnson on March 7, 2021. Plea Agreement, ECF No. 837, at 4–5. At the *Fatico* hearing, Newsome advised the Court that he was not challenging the Government's proof as to any racketeering act specified in his plea agreement except the attempted murder of Shelby Johnson.

associated with and operating principally out of the Trumbull Gardens housing project, also known as the "Terrace." It was an "association in fact" of multiple young men (and some women), dedicated to largely illegal activities: stealing cars, selling narcotics, committing "stains" or robberies, and committing acts of violence against rival gang members. Rival gangs included other young men from the East Side or East End of Bridgeport, the PT Barnum housing project, and the West Side of Bridgeport. Stratford Avenue (the "A") and the Sunshine Deli were locations frequented by gang members from the East Side or East End of Bridgeport. Defendants Garcia, Langston, and Newsome were members of O.N.E.

O.N.E. members, including Garcia, Langston, and Newsome, regularly communicated with each other and rival gang members on social media. They also regularly communicated with each other in group chats, which were themselves often dedicated to gang activities. Between 2018 and 2021, there was, for lack of a less hideous phrase, a violent gang war being waged in Bridgeport by and between the various neighborhood gangs. O.N.E. members were shot at, shot, and in some instances killed. And, not to be outdone, O.N.E. members also perpetrated acts of violence resulting in shootings and murders of rival gang members.[2] The *Fatico* hearing dealt principally with two such events—the murder of Len Smith on August 13, 2018, and the shooting of Shelby Johnson on March 7, 2021.

**The Murder of Len Smith**

Len Smith was not a gang member. He was in the wrong place at the wrong time when O.N.E. members Ta'ron Pharr (a/k/a "250") and others, driving a stolen Jeep Grand Cherokee,

---

[2] For example, Defendant Tyiese Warren, an O.N.E. member, pled guilty to RICO Conspiracy and acknowledged his involvement in the murder of Ty'Quess Moore, a rival gang member, as well as the attempted murder of four rival gang members outside the Superior Court for the State of Connecticut on January 27, 2020.

rolled up next to the car Len Smith was in and opened fire on the vehicle. The Government alleges that Pharr was with Lorenzo Carter[3] and Luis Garcia.

The evidence includes video of the shooting, which reveals the following. After midnight on August 13, 2018, the car Mr. Smith was in, a Buick, parked at the intersection of Stratford Avenue and Union Avenue. The driver exited the car and went into the Sunshine Deli. Mr. Smith and his girlfriend, Georgia Camargo, remained in the vehicle. At approximately 12:28 a.m., the Jeep Grand Cherokee drove parallel to the Buick. Three individuals can be seen in the Jeep. All three are armed and appear to be wearing blue gloves. The individuals cannot be identified based upon the surveillance footage. Soon after it arrived, the driver of the Jeep (with his right hand) reached across the front seat passenger with a gun and fired into the Buick. The front seat passenger also fired at the Buick, and it appears that a back seat passenger fired a single shot at the Buick. The front seat passenger is left-handed. Garcia is left-handed.

The evidence established, and it is not contested, that the Jeep Grand Cherokee was stolen four days earlier from a condominium complex in Newburgh, New York, by O.N.E. members (or associates) Jaylin Wilson, Henry Floy, Carter, Pharr, and Shakale Brantley.

The Government also relies upon the trial testimony of Henry Floy and Nathan Ocasio regarding the events that followed the shooting of Len Smith.

Henry Floy testified that he was a close associate of O.N.E. and many of its members. He was very close friends with Garcia. He often went "car-hopping" with O.N.E. members, which was a practice of looking for open cars and stealing anything of value found therein. If the key to the car was also located, the car itself was stolen. Floy testified that he also participated in armed

---

[3] After trial, a jury convicted O.N.E. member Lorenzo Carter of being one of the other two people in the vehicle responsible for the death of Len Smith. Carter faces up to 60 years in prison, a "life" sentence under Connecticut law.

"stains" or robberies with Garcia and others. Floy did not grow up in the Terrace, however. He moved to Bridgeport when he was 17 years old and became acquainted and close with O.N.E. and its members through people he met at Central High School. Floy was also a close friend of Nathan Ocasio. Mr. Ocasio testified that he too was a very close friend of Luis Garcia, and was an acquaintance of some of the O.N.E. members, but was not himself associated with O.N.E. or a member. Both Floy and Ocasio regularly hung out in the Terrace.

Floy and Ocasio testified regarding the night of the Len Smith homicide. Floy testified as follows: He, Ocasio, Antoine Sistrunk, and Zakwani Owen were hanging out and smoking marijuana in a Walgreens parking lot, near Ocasio's home, in the early morning hours of August 13, 2018. Brantley arrived at the parking lot with Pharr, Carter, and Garcia in his car. Pharr, Carter, and Garcia were very agitated and nervous. They explained that they had to get rid of the Jeep, that they had shot up "the Ave," and that the Jeep was "hot." Pharr indicated that his gun had jammed and he only was able to shoot once. Carter stated that they had "swiss cheesed" the Buick. Garcia stated that he fired five shots into the car and that he thought a rival gang member was in the car. Garcia also identified Carter as the driver. At this point, Ocasio entered his residence. Shortly thereafter, Floy went to Ocasio's home and asked to borrow money for "food." Ocasio gave him some money.

Sistrunk drove Floy to a nearby gas station where Floy used the money to fill a gas can with gas. Floy and Sistrunk then returned to the Walgreens parking lot. Sistrunk and Brantley drove everyone to Charron Street, where the Jeep was parked. Carter, Pharr, and Floy got into the Jeep. Garcia remained in Brantley's car, and Owen remained in Sistrunk's car. All three vehicles travelled to Indian Well Park. Once there, Pharr, Floy, and Carter wiped down the inside of the Jeep with bleach and then set it on fire. Floy rode back to Bridgeport with Brantley and Garcia.

Pharr and Carter rode with Sistrunk. Along the route back to Bridgeport, the vehicles stopped so that shell casings removed from the Jeep could be thrown into a sewer.

However, Brantley's car ran out of gas on the way, leaving Floy, Garcia, and Brantley stranded. Floy called Ocasio who went to pick up Floy. Garcia's girlfriend picked him up.

Regarding the same night, Ocasio testified that while he, Floy, Sistrunk, and Owen were hanging out at the Walgreens, Brantley arrived, driving an Infiniti, with Garcia, Pharr, and Carter. Garcia, Pharr, and Carter were acting nervous: "They were fidgeting. They was real scared." Ocasio testified that they had come from a shooting on "the Ave," which he understood to be Stratford Ave. The three, including Garcia, were talking about getting rid of evidence. At that point, not wanting to "be part of anything," Ocasio entered his residence. Soon after, Floy came to his house and borrowed some money for food.

Later in the night, Ocasio got a phone call from Floy and Garcia "because they ran out of gas and they wanted [Ocasio] to come pick them up." Ocasio went to pick them up, but Garcia was gone by the time he arrived. Ocasio drove Floy and Brantley home.

In the days and weeks following the murder, Floy was branded a "snitch" and a "rat" on social media. Ocasio began to be concerned for his own safety. Although Garcia reached out to him by text and on Facebook, Ocasio did not respond. Eventually, Garcia went to Ocasio's home and told him to "hold it down" for him, meaning not to cooperate with the police and that he planned to "run." Garcia also told Ocasio he was with Carter, Pharr, and a man named "Tyler" on the night of the murder, and that Carter had been driving a white Jeep.

If credited, the testimony of Floy and Ocasio, coupled with the video surveillance of the shooting, establishes Garcia's involvement in the homicide by a preponderance of the evidence.

Indeed, there can be little question that the jury in the trial of Lorenzo Carter found this testimony compelling when it found that Carter was guilty in the murder of Len Smith.

Notwithstanding, Garcia urges this Court to conclude that Floy's testimony is not sufficiently reliable to be considered by the Court or for the Government to meet its burden. Garcia first points to the myriad of statements Floy gave to investigators, some of which contained half-truths or falsely implicated others in the crime. To be sure, when first interviewed by the Bridgeport Police Department on August 15, 2018, Floy's statements were all over the map. And much of what he told investigators was not true. It is equally true that his statements evolved over time, in part because the investigation was revealing more and more information. However, that a person with knowledge of crimes, who himself participated in the destruction of evidence, is not immediately forthcoming when interrogated by the police, is not uncommon. And Floy was subject to a lengthy and vigorous cross-examination at trial as it relates to his prior inconsistent statements.

Garcia also identifies inconsistencies in Floy's trial testimony and his grand jury testimony regarding details of the burning of the Jeep, characterizing the trial testimony as "repeated lies." Finally, Garcia relies upon the more recently disclosed phone extraction which, Garcia posits, demonstrates that Floy's testimony regarding the night the Jeep was stolen and the night of the homicide was demonstrably false. Where the evidence conflicts, Garcia argues that a lie has been revealed. The Court disagrees.[4] As is clear from the briefing, conflicting evidence leads to conflicting inferences. None of the conflicting inferences, however, repudiate or make the core of

---

[4] The phone extraction data shows that Floy and Garcia were together during several periods of time on the evening of August 12 and the early morning of August 13. Garcia argues that this conflicts with Floy's trial testimony that he was "alone" with Ocasio during the day and night of August 12. But it is unclear whether the phone extraction data contradicts Floy's testimony. At trial, Floy testified that on August 12, while he was driving around Bridgeport with Ocasio, he *did*, in fact, see a number of O.N.E. members, including Carter and Garcia. Floy Trial Tr., ECF No. 1104, at 137:2–15. The phone extraction data therefore does not, contrary to Garcia's assertion, definitively show that Floy lied about who he was with the night before the murder.

Floy's testimony so unreliable as to be disregarded or otherwise insufficient to meet the Government's burden of proof. A sentencing court must ensure that the proffered evidence is reliable in order to protect the defendant's right to due process. *See Juwa*, 508 F.3d at 700; *United States v. Martinez*, 413 F.3d 239, 244 (2d Cir. 2005) (Sotomayor, J.); *United States v. Pugliese*, 805 F.2d 1117, 1122–23 (2d Cir. 1986). Due process is satisfied "when the defendant does not dispute the truth of the statements sought to be introduced," which is not the case here, "or the statements are sufficiently corroborated by other evidence." *Fatico*, 579 F.2d at 713 (citations omitted). In determining whether the proffered evidence is reliable, the Court must assure itself that the evidence is not "materially incorrect," that there is not "a significant possibility of misinformation," *id.* at 712, and that there is "some minimal indicia of reliability" accompanying the hearsay statements sought to be admitted. *Martinez*, 413 F.3d at 244 (quotations omitted).

Garcia levels similar attacks on Ocasio's testimony, characterizing his testimony as lies tailored to match Floy's testimony because Floy is his friend. Garcia's brief reads like a closing argument and is infused with incredulity that Ocasio's testimony could ever be believed. But Ocasio too was subject to vigorous cross-examination. And while some of the details about what transpired, where, and with whom, in the hours *before* the Len Smith homicide remain unclear and subject to competing inferences and evidence, this does not defeat on a wholesale basis the reliability of Ocasio's testimony as to what occurred *after* the murder, which clearly implicates Garcia in the conspiracy to murder Len Smith. Ocasio was not a gang member or implicated in any criminal activity. He was subpoenaed to testify as a lay witness, and Garcia offers little foundation for his wholesale character assault on Ocasio.

And whatever doubt might be cast upon Floy's character or veracity, his testimony did not stand alone. It was corroborated in large measure by Ocasio, and it is consistent with the mosaic

of evidence pieced together by law enforcement to include the burned Jeep recovered from Indian Well Park, social media posts, cell phone location information and extractions, and surveillance footage.

By way of example only, statements attributed to Garcia, Carter, and Pharr, by Floy, accurately describe the murder. The video reveals that the Buick was, in fact, "swiss cheesed," and it does appear that the back seat passenger only fired one shot, perhaps the result of a gun jamming, as purportedly lamented by Pharr. In addition, text messages from the night of August 12, 2018, less than two hours before the homicide, support the inference that Pharr and Garcia were meeting up in Trumbull Gardens. Carter similarly texted that he was going to Trumbull Gardens. Location data for Garcia's phone supports the inference that within an hour of the homicide, Garcia (by inference with Pharr and Carter) was in Trumbull Gardens. Pharr and Carter had participated in the theft of the Jeep used in the shooting. Garcia, Pharr, and Carter, on social media and elsewhere, branded themselves as "Crazy Gang" or Crazy G," a subset of O.N.E. At 11:48 p.m., Garcia's phone was locked. It was unlocked at 12:36 a.m. on August 13, 2018—8 minutes after the homicide. Garcia's phone was locked again during the time that the Jeep was burned. One of the shooters, like Garcia, was left-handed.

Garcia's conduct during the investigation also supports the inference that he was in the Jeep and participated in the murder. When interviewed in September 2018, Garcia told multiple verifiable lies, including: he was not in Bridgeport on the night of the murder and had not been in Bridgeport since that July; he disavowed knowing or communicating with Lorenzo Carter; he disavowed knowing Ta'ron Pharr; and he denied that his girlfriend picked him up in Bridgeport in the early morning hours of August 13, 2018. All of these statements were demonstrably false,

belied in part by Garcia's own social media posts, both before and after the shooting, and they permit an inference that Garcia acted with consciousness of his own guilt.

The Court has not identified every item of evidence supporting the conclusion that Garcia was in the front passenger seat of the Jeep when Mr. Smith was murdered but concludes easily that the Government has met its burden of proof that he was.

**The Shooting of Shelby Johnson**

Shelby Johnson testified at the trial of Carter and Joshua Gilbert. Her testimony included that she was ambushed outside her home on December 5, 2019 by three men driving a Ford Edge. While sitting in her car, multiple shots were fired into the car. Fortunately, she was only grazed on her shoulder. But there were 15 bullet holes in her vehicle. Social media posts and chats by O.N.E. members identified Johnson as the mother of two "opps," Shoddy and Biggie. Newsome and other O.N.E. members regularly taunted Johnson's sons on social media. After the shooting, another Facebook user appeared to suggest to Newsome specific taunts that could be made: "What you really should've said was how ya mom get popped and you or ya brother still ain't on nun." To this, Newsome responded, "Thatsss toooo much talkin." Of import, the social media taunting between O.N.E. members and Shoddy and Biggie included references to their mother, Ms. Johnson. For example, Gilbert told Biggie that his mother had called the police on Gilbert.

Ms. Johnson testified that on March 7, 2021, at approximately 9:30 p.m., she dropped a friend off in the PT Barnum housing project ("PT"). As she was leaving, a dark-colored Jeep Cherokee, with tinted windows and out-of-state license plates, crossed her path. She was immediately concerned so she drove in the opposite direction of the Jeep. She exited PT to the south, while the Jeep would have exited to the north. She then saw the Jeep rounding a bend and decided to drive as quickly as possible away from PT. As she entered Interstate 95 northbound,

the Jeep was right behind her.  She tried to accelerate but could not get away from the Jeep.  Then, shots were fired, and she was hit.  She drove herself directly to Bridgeport hospital.  She told a police officer she had been shot.  Johnson then underwent emergency surgery for her significant injuries.

Police were also able to review video footage from PT at the Fusion Center.  They located Ms. Johnson's vehicle and then identified the vehicle that followed her out of the area.  That same vehicle was also seen stopping at one point, and a young man, wearing only his underwear and shoes and socks, carrying his clothes, got out of the vehicle and ran away.  The Jeep appeared to begin following Ms. Johnson at 10:55:32 p.m.  Ms. Johnson exited PT at 10:55:50 p.m.  Ms. Johnson arrived at the hospital at approximately 11:02 p.m.

The police issued a "Be On the Lookout" for the Jeep.  Approximately 3 ½ hours after the shooting, at 2:27 a.m. on the morning of March 8, 2021, Bridgeport police spotted the jeep near the Greene Homes complex, followed the Jeep and conducted a motor vehicle stop of the Jeep on Interstate 95.  The driver of the Jeep was Toni Alves, Floy's ex-girlfriend and a close associate of many O.N.E. members.  The passengers in the vehicle were Newsome and Langston.  Toni Alves gave the police a false name and falsely claimed to have rented the vehicle.  The vehicle stop and arrest of Alves is captured on dash and body camera footage.  Alves was arrested.  Langston and Newsome were not.

The vehicle was rented by Langston's mother.  The car infotainment system had been connected to "Jahaz iphone" earlier in the evening but had disconnected at 9:39 p.m. on the night of the shooting.  In the glove compartment, police located a laser sight for a firearm, though no firearm was recovered.  DNA testing revealed three contributors and concluded that it was 100 billion times more likely that Langston contributed to the DNA on the laser sight as opposed to

three unknown individuals. Gun shot residue was found in both front and rear seats of the vehicle. The vehicle occupants were not swabbed for gun shot residue.

Law enforcement, through Detective Hanson with the Bridgeport Police, received a video taken on the night of March 7, 2021, which coincides with the surveillance footage showing the Jeep stopping briefly in PT, and a young, almost naked, man getting out of the Jeep and running away. The video was taken from inside the vehicle. It shows the young man (identified as DF), stripped of his clothing, being assaulted and taunted. One of the captors is seen holding a gun with which he strikes the young man. The person filming is wearing a black jacket with white stripes down the side of the sleeve. Though not clear, the jacket may have a hood, the inner lining of which is lighter in color.

The video has audio. One of the voices is female and was recognized by Det. Hanson as belonging to Toni Alves. One of the male voices berates the victim, saying, "Stop saying Mire's name," and "Keep Mire's name out your mouth." Amire Newsome goes by the nickname "Mire."

When arrested, Langston was wearing a black jacket with white stripes down the side of the sleeve but the jacket had no hood. In the back of his vehicle, however, was a black jacket with a hood that had a lighter inner lining.

The Government also offered and relies upon the cell-site/tower location data for both Langston's phone and the Jeep itself, both of which were serviced by AT&T. The CAST Report analyzing the data revealed that the Jeep and Langston's cell phone were using the same cell towers, or towers very near to each other, throughout the evening, including at the time of the shooting. This analysis strongly suggests that Langston's phone and the Jeep were travelling together.

Finally, the Government relies upon Toni Alves' phone calls from prison. Therein, she acknowledges that the car was used in a shooting; she complains that "Haz" has not put up her bond; she threatens to tell what happened if her bond is not posted; she expresses concern about being held responsible for what happened when she was driving; and she acknowledges that "Mire" was in the vehicle. Alves states that "if Haz don't put no money up for my bond he is gonna be the one going to jail 'cause I'm not playing none of that." Perhaps of greater import, Alves attempts to get Biggie's phone number, indicating she will tell Biggie where Langston's mother lives so that Biggie can get revenge by shooting Langston's mother.

This evidence supports the reasonable inference that Newsome and Langston were in the Jeep and participated in the conspiracy to murder and attempted murder of Ms. Johnson.

In response, Newsome and Langston focus on what is missing in the Government's proof or identify inconsistencies in the Government's proof. The Court agrees that the evidence surrounding the events of March 7, 2021, including the kidnapping of DF, does not align so perfectly as to reveal a single, definitive narrative. For example, DF, who appears to have his own reliability issues, indicated that he was kidnapped by three males and he escaped by jumping from the vehicle on I-95. This statement cannot be aligned with a female voice on the video, recognized to be Toni Alves, or the fact that DF is caught on camera fleeing the car in PT. The Defendants rely on the following facts: no gun was recovered; the Defendants were not swabbed for gun shot residue when the Jeep was stopped on Interstate 95; no shell casings were recovered along Interstate 95; Langston's jacket did not have a hood; Langston's phone "disconnected" from the Jeep infotainment system at 9:39 p.m.; and that data from the Jeep indicated the doors opening and closing multiple times throughout the relevant time period. The Defendants also generally critique the adequacy of the investigation. The Court does not dismiss the evidence from which competing

narratives and inferences might be made, or, more accurately, from which an incomplete picture emerges. But on balance, the better, weightier evidence identified above proves, by a preponderance of the evidence, that Newsome and Langston participated in the conspiracy to murder and the attempted murder of Shelby Johnson.

The Court does not herein set forth the entirety of the relevant offense conduct as it pertains to the RICO Conspiracy, and leaves to the Government, the defense, and the United States Probation Office the task of putting together a comprehensive narrative as has occurred in connection with various other co-defendants. The Court's findings are made to establish that Garcia participated in the conspiracy to murder rival gang members and the murder of Len Smith. His guidelines will be calculated accordingly. The Court's findings are also made to establish that Newsome and Langston participated in the conspiracy to murder rival gang members or their relations and the attempted murder of Shelby Johnson. Their guidelines will be calculated accordingly.

A sentencing schedule and referral to the United States Probation Office will be separately docketed.

**SO ORDERED** at Bridgeport, Connecticut, this 8th day of January, 2025.

    /s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE